FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
26 AUG 17 AM 11: 37

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. __________________________**

A.W., on behalf of herself and her minor daughter, E.W., :
Plaintiffs, :
v. :

COLORADO SPRINGS SCHOOL DISTRICT 11 BOARD OF EDUCATION, :

Defendant. :
x

COMPLAINT AND JURY DEMAND

Plaintiff/parent A.W., on behalf of herself and her daughter, E.W./"Student" (hereinafter collectively referred to as "Plaintiffs"), residing in Colorado Springs, Colorado, do allege and say:

<u>Preliminary Statement</u>

1. Plaintiffs bring this action against Defendant, Colorado Springs School District 11 Board of Education located at 1115 El Paso Street, Colorado Springs, Colorado 80903 (hereinafter "D11," or the "School District"), pursuant to 20 U.S.C. 1415(e)(2), as parties aggrieved by the findings and decision at the administrative level under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400 *et seq.*, and Colorado Exceptional Children's Educational Act (ECEA), C.R.S. 22-20-101 through 123, regarding violations of their procedural and substantive rights under the IDEA and ECEA law which deprived E.W. of her fundamental right to a free and appropriate public education (FAPE), and parent of her right to meaningfully participate in the IDEA process.

2. Plaintiffs also assert claims against D11 for unlawful discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. 794 *et seq.,* and demand damages and reimbursement of out-of-pocket costs including expert fees.

## Jurisdiction and Venue

3. Jurisdiction herein over plaintiffs' federal claims is conferred by 20 U.S.C. 1415(i)(3)(A), 29 U.S.C. 794 (a)(2), 28 U.S.C. 1331 and 28 U.S.C. 1343(a)(4). Supplemental jurisdiction over plaintiffs' state law claims is conferred by 28 U.S.C. 1367.

4. Venue is proper in this district under 28 U.S.C. 1391 (b).

## The Parties

5. At all relevant times herein, plaintiffs have resided in the D11 School District.

6. Student E.W. is a disabled child under the IDEA, ADA, and RA.

7. Student E.W. has been found eligible for special education and related services under the IDEA classifications of Other Health Impairment (OHI) and Serious Emotional Disability (SED).

8. Over the last eight years has been diagnosed with, *inter alia,* attention-deficit/hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), reactive attachment disorder (RAD), generalized anxiety disorder (GAD), panic disorder/panic attacks, affective psychosis, depression, sleep disturbance, and child and adolescent antisocial behavior.

9. Defendant, D11, is a local educational authority (LEA) which was responsible for providing E.W. with basic educational services and special education services at all relevant times herein.

10. D11 is a "program or activity" receiving federal assistance under Section 504.

11. D11 is a "public entity" under the ADA.

## Procedural History

12. On November 14, 2025, A.W. filed a due process petition against D11 before the Colorado Office of Administrative Courts (OAC), asserting claims under the IDEA and ECEA.

13. In the due process petition, plaintiffs claimed that D11 denied Student a FAPE and denied parent meaningful participation in the IDEA process during the period November 14, 2023 through the date of filing, *i.e.*, November 14, 2025, by failing to provide, *inter alia,* (a) appropriate Individualized Education Plans (IEP's) for Student, (b) evaluations for Student's SED, (c) services required under IEPs, (d) behavioral intervention plans and/or appropriate supports to address Student's behaviors that interfered with her learning and learning of others.

14. A hearing was held before the OAC during the week of April 6-9, 2026. The hearing was held virtually.

15. On May 18, 2026, the OAC issued its decision which was served via certified mail (Exhibit I; "OAC Decision"). Parent received the decision on May 22, 2026.

16. The OAC Decision erroneously found that parent had not proved that D11 deprived Student of a FAPE during the 2023-2024 and 2024-2025 school years on the basis that it had IEPs in effect during those years which were based on the OHI classification only, not SED, and did not address Student's behavioral needs, while the OAC Decision excused D11's failure to deliver even those services to Student during those years.

17. The OAC Decision correctly found that D11 denied Student a FAPE during the 2025-2026 school year but it erred in rendering a compensatory education award that is not appropriate for the Student.

18. With regard to the 2025-2026 school year, the OAC Decision erroneously and illogically ordered compensatory education based on services detailed in an IEP from the 2024-2025 school that was based solely on Student's diagnosis of ADHD, while ignoring Student's diagnoses of ODD, GAD, RAD, and the SED classification, which present barriers for Student's receipt of ADHD-related services.

19. The OAC Decision is in many respect subject to *de novo* review as it relied upon legal theories and legal conclusions as to the requirements of the IDEA, presumed material facts in favor of D11 based on attorney argument without competent evidence in the record to support those facts, rejected opinions and testimony by Plaintiffs' highly-qualified expert without countervailing expert opinions or other competent basis to reject that evidence, made findings of fact that were contradicted by documentary and testimonial evidence produced at the hearing including the testimony and admissions of D11's own witnesses, and mistakenly misstated testimony that was elicited.

Summary of Facts Established at the OAC Hearing

20. The following facts (¶¶21-85), were established at the administrative hearing based on the documentary and testimonial evidence including an expert report and expert testimony by Dr. Boris Gindis, Ph.D., a highly-qualified expert in the field of special education and on the psychological, cognitive, and educational consequences of early childhood trauma in children adopted from overseas institutional settings.

21. Student was born on August 20, 2010 in Vladmir, Russia, abandoned to an orphanage in a small Russian village, and adopted by Parent who brought her to the U.S. on August 31, 2011.

22. Student had pre-adoption experiences of abandonment, neglect, and prenatal drug exposure which caused significant, developmental delays and predisposed her to attachment difficulties and emotional instability later in life.

23. Student has had behavioral challenges since adoption. At three-years old, she entered a pre-school disabled program and at age five, was diagnosed with ADHD, ODD, and r/o RAD.

2023-2024 School Year: Holmes Middle School

24. Student began attending Holmes M.S. ("Holmes"), in the District in January 2023, with an IEP based on an ADHD diagnosis and Other Health Impairment (OHI) classification.

25. Beginning in January 2023 and through the spring at Holmes, Student had chronic conduct violations and disruptive behaviors that interfered with her learning and learning of others.

26. Through the spring of 2023, D11 was well aware that Student had chronic issues with being defiant and at times violent about attending school and suggested to parent that online or home-school groups may be a better fit for her.

27. In May 2023, parent filed a prior due process petition against D11 for failure to appropriately address Student's behavioral needs including behavioral needs pertaining to school avoidance.

28. In August 2023, the parties discussed settling that petition.

29. In August 2023, Deidre Schearer ("Schearer"), the District's special-education director then, and Maria Black ("Black"), a special-education facilitator, discussed amongst themselves that they suspected Student had RAD.

30. On August 15, 2023, the parties settled the prior due process case ("August 2023 Settlement").

31. In the August 2023 Settlement, D11 promised Parent that it:

a) "shall hold an IEP meeting to develop a behavior intervention plan ('BIP') for Student, ...to encourage her to regularly attend school" within 15 days;

b) would refer the family to a Community Program (named REACH), for behavioral support outside of school;

c) provide transportation to/from school and four hours of remedial instruction.

32. On August 31, 2023, the District asked Parent to consent to a Functional Behavioral Assessment (FBA), to analyze Student's behaviors as a precursor to the BIP, which she did.

33. The FBA consent form expressly stated that parent was asked to consent to an FBA to examine "student's inconsistent school attendance, resistance to come to school on time," and teacher concerns for "inconsistent academic engagement."

34. An IEP meeting was held on September 7, 2023, with Black, Parent, Jamie Freeling (Holmes Asst. Principal), Student, and others attending.

35. At the September 2023 meeting, Black shared her view that Student demonstrated characteristics of RAD and suggested that Parent obtain a RAD evaluation from REACH.

36. At the September 2023 meeting, D11 refused to provide Student with a BIP to address her school attendance as promised in the August 2023 Settlement on the rationale that when Student was observed at 15-second intervals over a period of twelve minutes in two morning classes, she was considered to be on-task at rates comparable to her peers.

37. The District did not conduct an FBA regarding "student's inconsistent school attendance," and "resistance to come to school on time."

38. The FBA assessment of August/September 2023, collected teacher and Student feedback that Student "engages in avoidance," "is disruptive to her own progress," "has the potential to set students off" talks too much and gets in trouble at school almost every day, has problems with peer interactions, and turns to peers to "avoid completing assignments."

39. However, D11 also refused to provide a BIP based on the "15 Second Momentary Time Sample Observations" referenced above in paragraph 36.

40. The District proffered an IEP in September 2023, that identified Student's needs and impact of her disability as follows: "[E.W.] diagnosis of ADHD impacts her ability to organize and attend to detail in order to access the general education curriculum without direct support from a special education teacher and classroom accommodations."

41. The IEP included goals regarding use of organizational tools, graphic organizers, and school attendance, but through the 2023-2024 school year, Student refused to use any organization tools or graphic organizers and had poor attendance.

42. Throughout the 2023-2024 school year, Student continued to engage in disruptive behaviors and resist and avoid school, resulting in disciplinary consequences including multiple suspensions from D11.

43. In March 2024, parent formally requested more support from D11 including classification and services for Student based on the SED classification and disclosed Student's diagnoses of GAD and depression, but D11 was unresponsive.

44. Throughout the 2023-2024 school year, D11 did not provide Student with counseling services required under the IEP then in effect which was confirmed by the District's exhibits and testimony of its own witness at the hearing.

45. At the end of the 2023-2024 school year, student had poor attendance, received F grades, did not meet IEP goals, did not meet grade-level expectations in any subject on standardized tests, and was not offered Extended School Year (ESY) services.

46. Due to D11's failure to provide a FAPE to Student during the 2023-2024 school year as aforesaid, Student was harmed emotionally and her mental health conditions worsened.

2024-2025 School Year: Palmer High School ("Palmer")

47. Student began her ninth-grade year at Palmer on August 12, 2024.

48. At the beginning of the 2024-2025 school year, parent reported a decline in Student's behaviors to the IEP Team and case manager.

49. At the beginning of the 2024-2025 school year, parent reiterated with the D11 IEP Team that Student should have an evaluation for RAD as stated by Black (above, ¶ 35).

50. Throughout the 2024-2025 school year, parent made further requests of the District for a BIP and/or other behavioral supports for Student, for transportation services, and for IEP goals related to school avoidance and attendance.

51. Throughout the 2024-2025 school year, D11 either ignored or rejected parent's requests.

52. In September 2024, D11 proffered an IEP for E.W. that again identified Student's needs and impact of her disability as solely related to a diagnosis of ADHD that "impacts her ability to organize and attend to detail" (as above, ¶ 40).

53. Without a BIP and/or other behavioral supports, student's behavioral challenges, oppositional and resistant behaviors and school avoidance intensified during the 2024-2025 school year.

54. At the due process hearing, evidence reflected that D11 teachers had challenges procuring Student's attendance at certain classes on days when she went to school, as they would see her in the hallways but not in classes and were unable to solicit her engagement.

55. The special education counselor was unable to connect with Student and unable to solicit her engagement in IEP-required special education counseling and consequently, Student did not receive school-based counseling as required by her IEP.

56. When Student refused to engage in IEP-required services, evidence at the hearing confirmed that parent was not informed and the District opted not to provide the services rather than address the barrier to IEP service delivery via the IEP process.

57. In about April 2025, Student's case manager contacted parent about conducting a re-evaluation of Student.

58. In April 2026, parented requested that the re-evaluation be adjourned to a more appropriate time, in view of Student's stress and resistance, but the case manager stated this was not possible, with one of the reasons given that parent sought evaluation for the SED classification that required in class observations by her current teachers.

59. In denying parent's adjournment request, the case manager suggested to parent that she revoke services at that time which she admitted at the due process hearing.

60. At this time, parent was informed by the D11 case manager that Student was not engaging in IEP services and the school allegedly could not deliver services if she was not engaging so the IEP was of no practical effect.

61. Based on these discussions and Student's emotional state at the time, parent temporarily revoked services on April 8, 2025 to avoid the re-evaluation then, and then on May 22, 2025, requested reinstatement of all her rights under special education laws.

62. On or about June 3, 2025, parent executed a consent to move forward with evaluations and requested that the District consider an alternative placement for Student involving a more structured program with smaller class sizes and less social distractions.

63. At the end of the 2024-2025 school year, Student had not met any of her prior IEP goals, she had poor attendance, she failed 4 classes and received D's in others, and did not meet grade level expectations in any subject based on standardized tests.

64. Due to D11's failure to provide a FAPE to Student during the 2024-2025 school year as aforesaid, Student was harmed emotionally and her mental health conditions worsened.

2025-2026 School Year: Evaluations at Palmer, Disenrollment, and Bijou

65. Over the summer of 2025, the District conducted a purported "re-evaluation" of Student without seeking parent or Student participation.

66. Based on the "re-evaluation" referenced in paragraph 65, the District scheduled an eligibility meeting on August 5, 2025, to consider Student's eligibility for services based solely on an OHI classification.

67. At the August 5, 2025 meeting, Student shared that she lacked motivation to attend school due to depression, anxiety, and feeling disconnected with peers which was confirmed in District IEP-related documentation.

68. At the August 5, 2025 meeting, the IEP team agreed to gather more information and to evaluate Student for SED.

69. During this next "evaluation" for SED, D11 did not obtain evaluate Student herself and did not include her feedback during the August 5, 2025 meeting regarding depression, anxiety, and peer problems in its evaluation report.

70. Dr. Boris Gindis, an Independent Educational Evaluator who testified as an expert, confirmed that several of Student's teachers from 2024-2025 endorsed concerns for her emotional dysregulation, depression, unpredictable and oppositional behaviors, and attendance and homework completion.

71. When two of Student's teachers from 2024-2025 completed DSM-5 ODD scales for Student at Dr. Gindis's request, they generated scores in the clinically-significant range a

72. On September 5, 2025, a District IEP team reconvened to assess Student's eligibility but no general education teacher was present and most of the attendees had little or no prior contact with Student.

73. At the September 5, 2025 meeting, school personnel said they struggled with identifying services that could help Student at Palmer and for this reason, proposed they could not find her eligible.

74. Parent responded that if Palmer did not have services to help Student, she needed a different school, reinforcing parent's prior requests for an alternative placement.

75. Turning to the eligibility form, the school team checked the first two boxes "No" *i.e.*, concluding that they believed the evaluation was not sufficiently comprehensive (#1), and that Student cannot receive reasonable educational benefit from general education alone (#2) but refused to find her eligible for services.

76. Shortly after the September 5, 2025 meeting, things spiraled downward with Student refusing school to stay in bed all day, failing most of her classes, and demonstrating highly volatile behaviors during home-to-school efforts. By September 25, 2025, Parent decided it was too emotionally unhealthy that she needed to unenroll Student from Palmer.

77. Parent thereafter enrolled Student in Goal Academy H.S. ("Goal") and requested special education supports for Student but was informed services could not be implemented based on the paperwork prepared by the District, and they would need to re-start the entire evaluation process over again.

78. Upon receiving this feedback from Goal, parent investigated the documentation and discovered that the District case manager had prepared IDEA documents after Student left Palmer in October 2025 stating that Student "did not qualify" under either OHI or SED, with parent and child's signatures placed on the forms based on "Webex attendance."

79. Student's emotional state deteriorated further after transferring to Goal.

80. In October and November, Student remained bedridden most days with the shades drawn and lights off and started having panic attacks; she had only three on-line classes, and by November 12, 2025, she was failing all three.

81. On November 14, 2025, parent filed the due process petition before the OAC.

82. In December 2025, the District referred Student to The Bijou School, an alternative high school, which she started attending on December 2, 2025, and on March 4, 2026, an IEP team at Bijou determined that Student is eligible for services under the IDEA based on the classification of SED.

83. The Bijou School has since been closed, and Student is now scheduled to start school as of this writing with Achieve Online, a "blended" online school with options for in-school attendance while receiving D11 support with a tutor.

84. The OAC Decision correctly found that the D11 District denied Student a FAPE for 2025-2026 but erroneously ordered services based on the 2024-2025 Palmer IEP which were based on an ADHD diagnosis and not delivered to Student during that school year based on barriers and interfering behaviors arising from her SED.

85. While a compensatory education award is warranted, the OAC Decision erred in ordering that the District deliver to Student ADHD/OHI services under the Palmer IEP that the

District previously was unable to deliver to Student due to her emotional conditions and SEDs which presented barriers to service delivery.

**COUNT ONE**

**IDEA – Child Find Violations Throughout Relevant Period**

86. Plaintiffs repeat the allegations of paragraphs 1 to 85 as if set forth at length herein.

87. The IDEA's Child-Find obligation requires school districts to identify, locate, and evaluate all "children with disabilities ... who are in need of special education and related services." 20 U.S.C. 1412(a)(3)(A).

88. Under the IDEA, a school district is required to evaluate a child "in all areas of suspected disability" (20 U.S.C. 1414 (b)(3)(B)), including social and emotional status, general intelligence, and academic performance. 34 C.F.R. 300.304(c)(4).

89. This child-find obligation requires that children are identified and evaluated "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *D.T. by & through Yasiris T. v. Cherry Creek Sch. Dist. No. 5*, 55 F.4th 1268, 1274 (10th Cir. 2022).

90. D11 was at a minimum on notice of Student's behaviors that interfered with her learning and learning of others likely arising from and/or manifesting from Student's RAD and/or other serious emotional disabilities.

91. The District denied Student FAPE by failing to evaluate her for RAD and/or SED within a reasonable time after being on notice of these disabilities.

92. The District's failure to meet child-find duties under the IDEA, 20 U.S.C.§ 1414 (b)(3)(B), denied Student FAPE during the 2023-2024, 2024-2025, and 2025-2026 school years, because Student's IEP teams were not informed of critical evaluative data about her needs as an emotionally-disturbed child which deprived her of appropriately-drafted IEPs and services.

93. The OAC Decision erroneously concluded that plaintiffs had not proved this denial of FAPE which is reviewable *de novo* because, *inter alia*:

a) the OAC Decision ignored, and made no mention of, uncontroverted evidence in the record that D11 itself raised the issue of Student's RAD at an IEP meeting in September 2024.

b) the OAC Decision ignored, and made no mention of, admissions by D11 witnesses that RAD, which it suspected Student had, causes challenges with relationships generally, including with peers and teachers, which Student was manifesting at school.

c) the OAC Decision ruled, as a matter o flaw, that it made no difference under the IDEA whether a student is classified under OHI or SED, as in either case, this opens "a full gamut of services," as this legal analysis rewrites the IDEA and renders sections of the IDEA superfluous.

d) the evidence at the hearing was uncontroverted that Student should have been evaluated for SED as of September 2023, because (i) plaintiffs' expert testified that the District should have evaluated Emily and determined her eligible under SED at the beginning of the 2023-2024 school year based on documentation confirming Student was demonstrating oppositional, argumentative, and provocative behaviors at school, poor school performance/failing grades, and poor attendance, and (ii) D11 itself suggested a RAD evaluation for Student but instead of performing this evaluation itself as required, referred plaintiffs to an outside agency which as a matter of law, did not fulfill its obligations to evaluate.

94. As a direct result of the foregoing, E.W. was caused to suffer educational deprivations and significant injury and damages.

## COUNT TWO

### IDEA – Failure to Address Behavioral Needs

95. Plaintiffs repeat the allegations of paragraphs 1 to 94 as if set forth at length herein.

96. The IDEA requires school districts to "consider the use of positive behavioral interventions and supports, and other strategies" when a child's "behavior impedes [her] learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i).

97. A school district must "adequately identif[y] a student's behavioral impediments and implement[] strategies to address that behavior" for an IEP to deliver FAPE. *Alex W. v. Poudre Sch. Dist.*, 94 F.4th 1176, 1188 (10th Cir. 2024) (quoting *M.W. ex rel S.W. v. N.Y.C. Dept. of Educ.*, 725 F.32d 131, 140 (2d Cir 2013)).

98. The District denied Student FAPE throughout the relevant period by failing to adequately identify Student's behavioral impediments and failing to implement strategies to address those behaviors in her IEPs.

99. The District's failure to adequately address Student's behavioral impediments and failure to implement services to address those impediments denied Student FAPE during the 2023-2024, 2024-2025, and 2025-2026 school years, as her behavioral impediments interfered with Student's learning, the learning of others, and created barriers to Student's receipt of services including IEP-required counseling services.

100. The OAC Decision concluding that plaintiffs had not proved this FAPE violation is erroneous and subject to *de novo* review because, *inter alia*:

a) there was no competent evidence in the administrative record to support a finding that the District adequately identified Student's behavioral impediments and implemented strategies to address those behaviors.

b) plaintiffs' highly-qualified expert in special education law, Dr. Gindis, testified that a trauma-informed BIP was an essential component to Student's IEPs to enable her to make meaningful progress.

c) the District did not offer any evaluations or expert testimony to contest Dr. Gindis's finding that Emily's behaviors including her absenteeism were disability-based which was uncontroverted on the record below.

d). the evidence confirmed the District repeatedly refused any BIPs for Student.

e) . the OAC Decision relied upon alleged testimony by Shearer as to the motivation for Student's behaviors when in fact, Shearer testified she had never met the Student; and

f) the OAC Decision relied upon alleged lack of medical substantiation that Student's behaviors were a manifestation of her disability which was legally erroneous as medical evidence is not required under the IDEA and the purpose of an FBA, which the District did not adequately perform, is to determine the cause/effect relationship for a Student's impeding behaviors.

## COUNT THREE

**IDEA – Eighth and Ninth Grade Inappropriate IEPs And Shortcomings in Services**

101. Plaintiffs repeat the allegations of paragraphs 1 to 100 as if set forth at length herein.

102. To "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

103. When IEPs were proffered for Student for the 2023-2024 and 2024-2025 school years, D11 had notice of E.W.'s ODD, RAD, depression, GAD, behavioral challenges and/or

social-emotional functioning but drafted IEPs with reference only to her ADHD diagnosis and focused on providing services for organizational skills.

104. Dr. Gindis credibly and cogently testified during the due process hearing how the Palmer IEP (2024-2025 school year), was a generic "ADHD IEP" which was fundamentally flawed due to failure to address Student's basic needs as a student with a neurodevelopmentally-complex and trauma-mediated profile.

105. Dr. Gindis cogently and credibly explained that the Palmer IEP did not accurately reflect how Student functions academically, emotionally and socially; it did not have goals directly tied to her documented needs; it did not provide services to actually teach the skills that Student lacked; and it did not promote meaningful progress observable and supported by data.

106. Even the District's own witness who spent the most time with Student stated that her "biggest barrier" in school was her "emotional balance" which was not addressed in the IEPs.

107. Additionally, Palmer H.S. did not have the resources to address Student's emotional and behavioral needs which the District knew, or should have known, when she was placed there.

108. The District denied Student FAPE by failing to have appropriate IEPs in place for her during the 2023-2024 and 2024-2025 school years.

109. The District further denied Student FAPE by failing to deliver counseling services set forth in those IEPs during the 2023-2024 and 2024-2025 school years, which the OAC Decision excused and/or overlooked.

110. As a direct result of D11's violation of the IDEA as aforesaid, E.W. suffered educational deprivations and significant injury and damages including consequential damages including, among other things, a misguided compensatory education award for 2025-2026, which the OAC Decision tailored based on the inappropriate, 2024-2025 IEP.

## COUNT FOUR

### ADA – Failure to Accommodate and Discrimination Against E.W.

111. Plaintiffs repeat the allegations of paragraphs 1 to 110 as if set forth at length herein.

112. During the relevant period from November 14, 2023 through November 14, 2025, D11 denied E.W. appropriate accommodations for her disabilities which deprived E.W. of an equal opportunity to participate in and enjoy the benefits of a service, program or activity of the School District.

113. Because of D11's failure to accommodate E.W.'s disabilities, for example, with interventions, supports, and appropriate educational placements, E.W. was excluded from participation in or denied the benefits of the services, programs, or activities of the School District.

114. With reasonable accommodations on the part of D11, E.W. could have benefited from educational services, programs, or activities in the School District which she was denied.

115. D11 knew or should have known that its failure to consider E.W.'s SED would deny her benefits of the services, programs, or activities of the School District and cause or contribute to her failure, but nevertheless disregarded those disabilities which created a significant barrier for her educationally and socially.

116. D11 violated E.W.'s rights protected by the ADA.

117. As a direct result of D11's violation of the ADA as aforesaid, E.W. suffered significant injury and damages including consequential educational and emotional damages and parent incurred out-of-pocket costs including expert fees.

## COUNT FIVE

### Section 504 – Discrimination and Retaliation against Plaintiffs

118. Plaintiffs repeat the allegations of paragraphs 1 to 117 as if fully set forth herein.

119. During the relevant period, D11 acted with deliberate indifference to E.W.'s

federally protected rights and in particular, to her right to special education and related services as an emotionally-disabled and traumatized child.

120. D11 did not provide E.W. with regular or special education and related aids and services designed to meet her individual educational needs as adequately as the needs of non-handicapped students are met.

121. Additionally, during the 2025-2026 school year, D11 retaliated against E.W. and her parent based on parent's having revoked services in April 2025, and/or based on E.W.'s disability.

122. During the 2025-2026 school year, and refused to properly evaluate E.W. or consider her eligible for services or offer her appropriate services based on her oppositionality to special education services which itself was a manifestation of her SED, reflecting disability-based discrimination and retaliation against E.W.

123. D11 violated plaintiffs' procedural and substantive rights guaranteed under Section 504 and implementing regulations at 34 C.F.R. 104, Subpart D.

124. Based on D11's discriminatory and intentional actions, plaintiffs are entitled to compensatory damages for mental anguish and damages including consequential damages arising from D11's conduct as aforesaid including out-of-pocket costs and expert fees.

**COUNT SIX**

**Violations of the ECEA**

125. Plaintiffs repeat the allegations of paragraphs 1 to 124 as if set forth at length herein.

126. D11's conduct as aforesaid constitutes substantive and procedural violations of the Colorado ECEA, C.R.S. 22-20-101 through 123.

127. As a direct result of D11's violation of the ECEA, plaintiffs. suffered significant injury and damages.

## Jury Demand

Plaintiffs demand a jury as to all issues triable to a jury.

## Prayer For Relief

WHEREFORE, plaintiffs request herein:

1. Plenary review of the administrative record;
2. Judgment granting the following relief:
   a. Reversing the OAC Decision to the extent it found that plaintiffs did not prove D11 denied Student of FAPE during the 2023-2024 and 2024-2025 school years;
   b. Granting an award of compensatory education for E.W. for the 2023-2024 and 2024-2025 school years including an educational fund and/or placement at an appropriate therapeutic boarding school during the summer of 2027;
   c. Modifying the compensatory education award entered by the OAC with respect to the 2025-2026 school year;
   d. Requiring that the District provide E.W. with an appropriate IEP for the 2025-2026 school year accurately reflecting her needs and situation regarding educational placement;
   e. Granting plaintiffs an award of damages for their injuries including appropriate compensatory education awards for the denials of FAPE as detailed herein and damages under the ADA and Section 504 and out-of-pocket costs incurred by parent including expert fees; and
   f. Granting such other relief as the Court deems appropriate and just.

Respectfully submitted,

*s/ Anastasia P. Winslow*

_______________________________

Anastasia P. Winslow
1332 N. Tejon Street
Colorado Springs, CO 80903
Phone: 719-287-1910
Email: winslowlawco@gmail.com
Parent *pro se*, for Plaintiffs

Dated: August 17, 2026

## D.C.COLO.L.CIV RULE 3.2 CERTIFICATION

Pursuant to Local Civil Rule 3.2, I hereby certify that this matter in controversy is not the subject matter of any other action pending in any court or of any arbitration or administrative proceeding.

Respectfully submitted,

*s/ Anastasia P. Winslow*

ANASTASIA P. WINSLOW
Parent *pro se,* for Plaintiffs
Email: winslowlawco@gmail.com

Dated: August 17, 2026

A.W. o/b/o E.W. v. COLORADO SPRINGS SCHOOL DISTRICT 11

# Exhibit 1 to Complaint

DECISION OF COLORADO OFFICE OF ADMINISTRATIVE COURTS

Dated May 18, 2026

| | |
|---|---|
| **State of Colorado**<br>**Office of Administrative Courts**<br>1525 Sherman Street, 4th Floor, Denver, Colorado 80203 | |
| **Anastasia Winslow on behalf of her minor child, E.W.,**<br><br>Complainant,<br><br>v.<br><br>**Colorado Springs School District 11,**<br><br>Respondent. | ▲ Court Use Only ▲<br><br>Case Number:<br><br>**EA 2025-0074** |
| **Decision** | |

If you need a screen-reader-friendly version of this document, please contact the OAC through one of the following options:

Form: ADA Accommodation and Accessible Document Request

Email: dpa_oac-gs@state.co.us

Telephone: 303-866-2000

Complainant Anastasia Winslow ("Complainant" or "Parent") filed a Due Process Complaint ("DPC") on behalf of her minor daughter ("E.W." or "Student"), which was received on November 18, 2025, alleging that Colorado Springs School District 11 ("Respondent" or "District") denied Student a Free and Appropriate Public Education ("FAPE"), in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, and the Colorado Exceptional Children's Educational Act ("ECEA"), C.R.S. § 22-10-101, as implemented by the federal regulations at 34 C.F.R. § 300 and state regulations at 1 C.C.R. § 301-8.

An evidentiary hearing was conducted via Google Meet on April 6 through April 9, 2026, before Administrative Law Judge ("ALJ") Patrick C.H. Spencer II. Parent

appeared without representation. After an appropriate advisement, Parent elected to proceed *pro se*. Respondent was represented by Deborah S. Menkins, Esq., Martha Kohlstrand, Esq., and Julie A. Bellville, Esq.

Parent and Dr. Boris Gindis testified for Parent. Maria Black, Mary Van Korlaar, Mary Raymond, Jennifer Hagood, Sarah Scheidt, Gesine Steinbach, Roger Erber, Mary McOsborne, Karla Castro, Kendal Alvis, and Dierdre Shearer testified for Respondent.

The following Exhibits were entered into evidence: Complainant's Exhibits 1, 2, 4, 6-19, 21-23, 25, 27, 30, 32-34, 38, 39, 41, 42, 44, 46, 47, 49, and 50, and Respondent's Exhibits A-C, E-L, N, P-Z, BB, DD, EE, FF, GG, HH, KK, NN, and TT.

At the conclusion of the hearing, the parties were given until May 1, 2026, to submit written closing arguments. The parties' briefs were timely received, and the matter is ready for an Order. By agreement of the parties, the deadline for decision was extended to May 18, 2026.

**Issue Presented**

- Did Parent prove by a preponderance of the evidence that District denied Student a FAPE on or after November 18, 2023, by failing to develop appropriate IEPs? Subsumed within the foregoing question, Parent has raised following additional sub-issues:
    - a. Did the District deny a FAPE by failing to appropriately identify and address Student's behavioral needs?
    - b. Did the District deny a FAPE by failing to timely assess Student and provide services based on the Serious Emotional Disability ("SED") classification?
- If District failed to provide a FAPE, what is the appropriate remedy?

## Findings of Fact

### *A. Background and history*

1. Student is currently 15 years of age and attends high school in the District. She has no history of grade retention and was in 10th grade at the time of the hearing.

2. Student was adopted from an orphanage in Russia at 11 months of age. As an infant, she showed significant signs of neglect and experienced delays in developmental milestones such as walking and speaking. Nevertheless, she started school on time and intellectual testing has shown above-average full-scale IQ scores.

3. Student was evaluated for special education in 2013. The evaluation team described delays in pragmatic language, expressive language, and delayed social development. She was found eligible for special education under the category Preschool Child with a Disability.

4. A reevaluation in 2015 revealed high average to superior cognitive abilities in verbal comprehension and fluid reasoning, and average abilities in visual, spatial, working memory, and processing speed.

5. Testing in 2017 confirmed similar cognitive abilities as in 2015, but discrepancies between strengths and weaknesses had widened (VCI = 124, WMI = 88). Student's profile was consistent with ADHD, combined type.

6. A special education evaluation was conducted in November 2021 at Skyway Elementary School (School District No. 12). Student demonstrated weakness in spelling and writing conventions, though her performance improved with intervention. Student was found ineligible for special education at that time.

7. Parent requested an Independent Educational Evaluation ("IEE"), which was conducted by Colleen O'Donnell, Ph.D., on May 6, 2022. Academic Functioning was assessed through a variety of tools. Testing of attention and executive functioning produced scores in the high ADHD total symptom level. Student was ultimately found eligible for special education in the Fall of 2022, while attending North Middle School.

8. Student enrolled at Holmes Middle School ("Holmes") in the second semester of 7th grade (January 2023). She had transferred to Holmes to escape severe bullying. Student was refusing to attend school because of the bullying, and Parent

hoped the change of environment would improve her performance and ability to focus on schoolwork.

9. Student had an Individualized Educational Program ("IEP") in place when she started at Holmes January 2023, based on the diagnosis of ADHD.[1]

10. Student's teachers at Holmes documented behavioral issues during the winter and spring of 2023, including excessive talking during lessons, distracting other students, and lying about having a cell phone in class. Also during that time, Parent was struggling to get Student out of bed to school in the morning.

11. Parent requested adjustment of Student's IEP but was dissatisfied with the school's response. As a result, she filed a Due Process Complaint in June 2023, alleging a denial of FAPE.

12. The parties reached an agreement to settle the Due Process Complaint on August 15, 2023. The District agreed to: (1) provide transportation to and from school during 2023-24 school year (8th grade); (2) hold an IEP meeting to develop a behavior intervention plan ("BIP") to encourage regular school attendance; (3) provide four hours of tutoring for remedial instruction; (4) provide Student with pull-out special education services as specified in her IEP; and (5) refer Student to the Community Management Program ("REACH") to provide additional behavioral support outside of the school setting. The parties specifically agreed that the District was not obligated to provide any services that REACH could provide, but chose not to, or that REACH offered but Student and Parent declined.

13. The Agreement further provided that, except for the pull-out services referenced in item #5, "none of the services [describe above] shall be included in [Student's] IEP during the 2023-2024 academic year. Such services may be included after such time if [Student's] IEP determines that they are necessary for [Student] to receive a free appropriate public education under applicable law."

14. Pursuant to 20 U.S.C. § 1415(e)(2)(F)(iii), the settlement agreement included a clause that it was "enforceable in any State court of competent jurisdiction or

[1] At all times pertinent to this decision, Student's placement has been in general education classes at least 80% of the time.

in a district court of the United States." At hearing, the parties agreed that the Office of Administrative Courts does not have jurisdiction to enforce the settlement agreement.

### B. *2023-2024 Academic Year – 8th Grade – Holmes Middle School*

15. The 2023-24 school year (8th grade) started on August 16, 2023. The District provided transportation services.

16. The District conducted a Functional Behavior Assessment ("FBA") on September 3, 2023, to determine if a BIP was appropriate. Parent reported significant issues at home related to lack of motivation, defiance, and displays of anger. However, school personnel did not observe similar issues in the school setting. Student's teachers described some minor behavioral issues and inconsistent academic performance, but she generally worked well "when engaged." Student's art teacher noted "avoidance" behavior, noting that Student "will come up with excuses why she cannot do something." On the other hand, Student's math teacher described her as "a model student" who "comes to class on time and works." Parent indicated that the provision of transportation services had significantly improved the attendance issues.

17. The FBA showed no "observable targeted behaviors" for which the District could implement specific interventions. The District concluded, "through observations and interviews with staff, the parent, and the student, the team believes [Student] engages in behaviors that can be non-compliant with academic work, such as talking with peers, in order to escape academic tasks. Another possible explanation for [Student] talking in class is that she wants attention from peers." Based on the FBA, the District determined that a BIP was not appropriate.

18. On September 7, 2023, the District and Parent met for an annual review of Student's IEP (the "2023 IEP"). Student qualified for Special Education support under the category of "Other Health Impairment" based on "[a] diagnosis of ADHD." The IEP further states that, "[Student] may not consistently display overt signs of ADHD or Executive Dysfunction; however, historical data and evaluations show that [she] has difficulty with task initiation, sustained effort and difficulty working through larger amounts of material that require more processing time. This can affect her ability to make progress in all areas of the Colorado State Academic Standards including work

completion, standardized testing, organizing and working through projects, [and] formulating sequential responses." The IEP called for 75 minutes of organizational instruction services per week, 150 minutes of self-advocacy services, and 60 minutes of counseling services per month. Additionally, it established the following measurable goals:

- **Academic access and Self-Advocacy**: In order for [Student] to be successful in her courses, [Student] will develop and use an organizational routine such that she completes and turns in assignments 90% of the time.
- **Healthy Friendships and Self-Advocacy**: [Student] will be able to identify six attributes and traits of healthy friendships and demonstrate specific skills to develop and enhance those friendships.
- **Decision Making and Goal Setting**: [Student] will create a goal to attend class 100% of the time (when not an excused absence) in order to earn A's and B's in her classes.
- **Writing and Organization**: [Student] will demonstrate sequence with her organization by using graphic organizers with 80% accuracy.

19. The District and Parent investigated various strategies and incentives to encourage consistent school attendance during the 2023-24 school year. For example, Parent suggested that opportunities to assume leadership roles might motivate Student to get to school. However, when the school Principal met with Student to discuss various options, Student declined to participate after learning they would require changes to her schedule. The District also explored incentives such as skipping assignments, extra time with teachers, or computer time, each of which Student declined. The only incentives that appealed to Student involved food, but she was only interested in unhealthy snacks that were unacceptable to Parent.

20. Email exchanges between Parent and various teachers during the Fall 2023 semester reflect several instances of Student refusing to complete assignments and disrupting class with excessive talking. Student attributed at least some of these episodes to forgetting to take her ADHD medication. Student received at least two in-school suspensions ("ISS") in December 2023 for disruptive talking. There was no

persuasive indication that these issues were related to anxiety or depression, and the District reasonably interpreted them as consistent with ADHD.

21. Student did not receive access to the counseling services during the Fall 2023 semester because the school psychologist, Mary Van Korlaar, was unexpectedly on medical leave due to serious health problems. On November 9, 2023, the District sent Parent a Prior Written Notice ("PWN") explaining that due to "lack of qualified personnel . . . your child is not consistently receiving the social/emotional services listed on their IEP. We are monitoring the amount of missed services during this period of staff shortages. Once we are able to hire, we will offer to meet with you to determine the need for any compensatory services."

22. Ms. Van Korlaar returned from leave at the start of the Spring 2024 semester and conducted two group sessions with Student and other children. Ms. Van Korlaar subsequently took additional medical leave for another serious medical condition. She met briefly with Student on February 27, 2024, and "let her know that I would be out on another medical leave and encouraged her to reach out to counselors or case manager in my absence." Holmes subsequently retained a contract social worker, and any missed minutes were tracked and made up before year-end.

23. Quarterly reports on the IEP from the Fall 2023 semester indicated Student was maintaining reasonable attendance and making progress on her attendance goal. There was an indication that she missed her ADHD medication on many days, which interfered with her ability to focus and complete work. Student earned good grades in the first quarter of Fall Semester 2023, with two A's, two B's and two C's. Her performance slipped in the second quarter, with two B's, two C's, and two D's.

24. Student's attendance declined in the Spring Semester 2024, as did her grades.

25. The District provided the four hours of remedial writing tutoring required by the settlement agreement. The District faced challenges finding an outside tutor who could accommodate Student's after-school dance schedule. Ms. Phillips was willing to provide tutoring, but Student initially stated she "absolutely does not want to be tutored by" Ms. Phillips. It appears that issue was resolved and Ms. Phillips was able to provide the tutoring during Student's advisory of "Hawk" time during the Spring semester.

26. On March 4, 2024, the District convened a meeting at Parent's request. Parent expressed frustration with REACH concerning her desire to have Student evaluated for Reactive Attachment Disorder ("RAD"). The notes indicated that Parent met with REACH and least two outside agencies had been contacted. There were "phone calls back and forth" but no evaluation had occurred. The District indicated it would follow up with the Individualized Services and Support Team ("ISST"). Parent reported that Student had recently been diagnosed with anxiety and depression, for which she had been referred to "psychiatry" and was prescribed Zoloft.[2] The transportation services provided by the District were "doing well" and "very helpful in getting her to school." However, Student had "been out a lot due to illness". Some teachers had reported that Student had been "disrespectful and disruptive." Parent and student's sister reported anger and mood swings at home, although there is no indication that Student displayed similar behaviors at school. Parent had recently gotten a referral for family counseling, but Student never received therapy. Student was noted to be making some progress on her IEP goals related to organization and attendance, with her major impediments attributed to poor attendance, failure to make up missed work, and refusal to use organizational tools. She was not making progress on her writing goal.

27. At the end of the spring semester, Student's grades were two B's, two C's and two F's. Student completed the school year on time and was promoted to the 9th grade.

### *C. 2024-2025 Academic Year – 9th Grade – Palmer High School*

28. On August 12, 2024, Student began ninth grade at Palmer High School ("Palmer") with her 2023 IEP in effect. On September 3, 2024, the District convened an annual IEP review meeting. The attendees included Parent, Student, Mary Raymond (special education case manager and special education teacher), Jennifer Hagood (special education facilitator), Sarah Scheidt (social worker), Kristin Matta (general education counselor), Rebecca Ward (assistant principal), Laura Waltz (teacher). At the

---

[2] There is no persuasive evidence that the corresponding medical records were submitted to the District, or that Student followed up with a psychiatrist.

time the 2024 IEP was developed, Student's only documented diagnosed were ADHD. The IEP stated that Student's diagnosis of ADHD impacted her ability to organize, attend to detail, overcome barriers to accessing class content without support from special educational staff. Student reported difficulties paying attention and that she sometimes struggles to get started with her work because she is not sure what she needs to do. Neither Student nor teachers described any functional limitations related to anxiety or depression creating significant barriers to education. The 2024 IEP provided for 15 minutes per week of writing services inside the general education classroom, 30 minutes per week of special education services outside the general education classroom, 30 minutes of indirect services, and 60 minutes per month of mental health counseling. The IEP also established the following measurable goals:

- **Self-Advocacy:** To access support for her needs as a professional dancer, [Student] will increase her self-advocacy skills by requesting accommodations or support by requesting accommodation or support from a teacher or peer when facing a challenge or barrier in 60% of opportunities.
- **Organizational Skills**: [Student] will complete 80% of assignments in core content classes (Science, Social Studies, Math, and English) with a score of 80% or higher in 6 out of 8 bi-weekly opportunities.
- **Writing**: Within 36 instructional weeks, [Student] will score a 4 or higher on the IB Organizing rubric for classroom quizzes and written papers in 6 opportunities.

29. Although Parent requested an attendance goal based on historical issues, after discussion, the parties agreed to give Student "a fresh start" with the new school year, since she had not yet demonstrated significant attendance problems. More important, the District had no persuasive evidence that Student's attendance issues were causally related to her known disabilities. Nevertheless, even though the IEP contained no attendance goal, the District gave Parent access to Student's PowerSchool account and offered to provide transportation services to support Student's attendance at school. Student expressed opposition to transportation provided by the District because she did not want to appear as a "SPED" student when being dropped off at school. At the time of the 2024 IEP meeting, Parent stated that she

would drive Student to school "as long as she is maintaining good attendance." *Id.* Otherwise, they would revisit the issue of District-provided transportation.

30. Ms. Raymond recommended that Student enroll in an Affective Needs class titled "Fundamentals of Vocational Education," taught by Gesine Steinbach. Ms. Steinbach holds special education endorsements, including an "affective needs" endorsement for students with significant emotional disabilities, and she has 18 years of experience teaching students with mental health needs. Ms. Steinbach testified that Student was "generally engaged in participating" in her class and "very much able to synthesize her knowledge." In Ms. Steinbach's view, Student's sole barrier to success was her attendance. Student did very well in Ms. Steinbach's class because Student was "smart" and "interested."

31. On November 14, 2024, Parent advised Ms. Raymond that Student was consistently late for school because she was refusing to get out of bed and get ready in the morning. Parent further noted that, although Student was eligible for transportation, "I don't think that's going to make a difference at this point, it will probably just be a waste of car expense services."

32. Parent asked if Student could start the school day with second period in the Spring 2025. A January 30, 2025, email from Parent confirms that this change was implemented.

33. In January 2025, Parent requested that the District provide transportation services to facilitate Student's arrival at school. Ms. Raymond contacted the appropriate department to initiate transportation. She also informed Parent she could not guarantee the district would provide an Uber car instead of a bus (to which Student was opposed).

34. Sarah Scheidt, a special education social worker, provided mental health services to Student under the 2024 IEP. Ms. Scheidt credibly opined that the social work services set forth in the 2024 IEP were appropriately designed to address Student's needs. Ms. Scheidt first met with Student on August 19, 2024, and offered Student a wide variety of choices regarding the format and content of her sessions. However, Student told Ms. Scheidt that she was not interested in social work services and unwilling to participate in counseling sessions. Consistent with that expressed sentiment, Student declined to attend every scheduled meeting with Ms. Scheidt after

the initial appointment. Ms. Scheidt generally does not force students to accept counseling, which typically renders the support ineffective and discourages students from seeking help in the future. However, to fulfill Student's IEP mandates while respecting her preferences, Ms. Scheidt came into Student's classroom for an extra 30-60 minutes per month to build rapport and teach class content on topics that addressed Student's IEP goals.

35. Ms. Scheidt's classroom observations indicated that Student functioned well socially and academically. She saw Student completing work, smiling, and having reciprocal conversations with peers. Ms. Scheidt observed no behavioral or emotional concerns that flagged a need for more intensive mental health interventions or a more restrictive educational placement.

36. In March 2025, Ms. Scheidt contacted Parent directly to check on Student and inquire if there was any way she could provide support. On March 10, 2025, Parent advised Ms. Scheidt that, "I spoke with [Student] and she is very opposed to the counseling. We agreed that as long as she has good attendance, she doesn't need to do counseling but if her attendance drops, then she does. Hope you are good with this and holding off as long as she goes to school regularly." Ms. Scheidt replied that, from her experience, "if a student is highly against coming to social work sessions, they don't get much benefit, and it can make them more against it in the future." However, Ms. Scheidt indicated she remained "available if you or [Student] need anything."

37. Near the end of March 2025, Palmer placed Student on an attendance contract.

38. In early April 2025, Ms. Raymond contacted Parent to discuss Student's upcoming annual re-evaluation, which had a deadline of September 3, 2025. When a reevaluation is due at the start of the following school year, the District conducts the evaluation before the end of the current school year so that staff have sufficient time to collect the data needed to write an effective IEP. Ms. Raymond explained that such information could include observations, teacher surveys, and evaluations by the school social worker. The teacher observations would be particularly difficult if they waited to the start of the next school year because Student's new teachers would have limited time to get to know her by the reevaluation deadline. Parent asked to postpone the

evaluation based on Student's refusal to participate and strong resistance to special education services in general. Ms. Raymond explained the evaluation could not be postponed but it would not be required if Parent revoked consent for special education services. Ms. Raymond emphasized she was not advising or recommending that Parent revoke services but was simply discussing the available options. She indicated Parent should discuss it with Student and let her know if they decided to do it. Otherwise, she would move forward with the reevaluation as planned.

39. Ms. Raymond's testimony regarding this issue is credible and more persuasive than any contrary testimony or statements offered by Parent regarding the substance of their conversations.

40. On April 3, 2025, Parent and student verbally requested revocation of special education services. Parent subsequently submitted an executed Revocation of Consent for Special Education and Related Services form (the "Revocation Form") on April 8, 2025. Parent acknowledged that if she initiated the special education process in the future, a full initial evaluation would need to take place to determine eligibility. Parent further acknowledged that she was waiving any claim that the District failed to satisfy any obligations it had or may have to provide special education services to Student. Following the revocation, the District ceased providing special education and related services to Student, and she was considered a general education student.

41. Parent emailed Ms. Raymond on May 22, 2025, the second-to-last day of the school year stating that the revocation had been a "mistake" and asking to "revoke the revocation and go forward with the evaluations." Parent said she "gave into all [Student's] demands and complaints" and signed the revocation, which was "not the right thing to do." On Sunday, May 25, 2025, over Memorial Day weekend, Ms. Raymond responded that, because special education consent had been revoked, the District could not simply "unrevoke" it; rather, an initial evaluation would be required. Given the timing, Ms. Raymond indicated the evaluation would need to occur at the beginning of the next school year.

42. On May 23, 2025, Parent requested that Student be placed in summer school. Although the enrollment deadline for summer school had already passed, the District was able to get her enrolled in a summer school English class.

43. On June 4, 2025, Deirdre Shearer, the District's then Executive Director of Special Education, sent Parent the Consent for Evaluation Form, which Parent signed and returned on June 5, 2025. The District scheduled the initial eligibility meeting for August 5, 2025, the first staff workday of the 2025-2026 school year.

***D. 2025-2026 Academic Year (10th Grade)***

44. The IEP team met on August 5, 2025, to consider Student's eligibility for an IEP. The meeting was attended by Parent, Student, Ms. Raymond, Halley Brooks (math teacher), Cara Woundy (special education facilitator), Mary McOsborne (school psychologist), Erin Blake (school psychologist), and Ms. Hagood (individualized education facilitator). In preparation for the meeting, the team reviewed records including Student's grades and test scores, a report from Ms. Scheidt, and feedback from Student's teachers from the 2024–2025 school year. Ms. Scheidt could not complete a social history because of "scheduling barriers," and a current social work observation was not done because the evaluation took place outside of the school year. The parties discussed Student's poor attendance the previous year, and Student expressed that "lack of motivation and depression led to her school avoidance." The meeting concluded without a resolution, because the IEP needed "additional targeted assessments" before an eligibility determination could be made. A follow-up meeting was scheduled for September 5, 2025.

45. The 2025-2026 school year started on August 12, 2025. Although Student arrived on time for the first day of school, she missed five classes. Parent notified Ms. Raymond and asked for an attendance plan, which Ms. Raymond immediately forwarded to Roger Erber, the Dean of Students. After more absences on August 19, 21, and 22, Student was placed on an attendance contract.

46. In preparation for the September 5, 2025 IEP meeting, Ms. McOsborne collected additional data regarding Student's social-emotional functioning through several standardized assessments. Ms. McOsborne utilized the Multidimensional Anxiety Scale for Children (MASC), the Children's Depression Inventory (CDI), and the Behavior Assessment System for Children (BASC).

47. Additionally, Ms. McOsborne met with Student twice. Student refused to complete any self-report forms. Student expressed that she did not want or need special support or interventions. Student believed that her existing attendance contract and agreements with Parent were sufficient to manage her performance. Ms. McOsborne noted that Student was reluctant to appear different from her peers or to be singled out as a "special ed" student.

48. The IEP team reconvened on September 5, 2025, to complete the assessment. During the meeting, Student was frustrated and irritated and repeatedly questioned why the meeting was occurring before storming out of the room. As a result, the IEP team had limited self-reported information to consider.

49. The team reviewed academic data from the Spring 2024 CMAS, Spring 2025 PSAT scores, and Star assessment data from August 2025. The Star testing demonstrated growth in reading to the 55th percentile, although her math score remained in the "Partially Met Expectations" range. Teachers reported that Student is academically capable and performs at or above grade-level expectations when she is present in class, yet her grades are significantly hindered by high rates of absenteeism and a pattern of missing assignments.

50. Parent's responses to the MASC-2 and CDI-2 indicated a high probability of anxiety disorders and very elevated levels of depressive symptoms, particularly regarding Student's functioning and mood at home. However, these results were not mirrored in the school setting, as teacher assessments on the CDI-2 and BASC scales typically fell within the average range for emotional and functional problems. School staff described Student as kind and respectful when in class, noting that while she displayed some resistance to adult help and struggled with motivation, she often preferred to work independently and communicated effectively when she chose to engage.

51. Parent submitted a medical summary showing that Student had previously been prescribed Clonidine and Concerta for ADHD and Amitriptyline for depression; however, these medications were referenced as "Not Taking/PRN." There is no mention of any medications typically used to treat anxiety. The report listed diagnoses including "ADHD," "Oppositional defiant disorder," "Mood change," and "Medical non-compliance."

Mental health screenings conducted on May 5, 2025, were consistent with "mild" anxiety and depression. No mental health treatment recommendations were made.

52. Although Parent had previously reported diagnoses of "severe" anxiety and depression, there is no persuasive evidence that the District medical records to support those statements. Similarly, no medical records or other persuasive evidence was submitted at hearing indicating that Student received any significant mental health treatment to address anxiety or depression.

53. Ultimately, the IEP team determined that Student did not qualify for special education services. The team concluded that Student's primary barrier to educational benefit was inconsistent attendance rather than a disability and identified no significant area of need within the school setting that could not be addressed through general interventions. However, recognizing that "it could be too early in the year to see an area of need as well as too little time to see how [Student] was responding to school based interventions," the team agreed that Student would continue to receive education supports, including remaining in a study skills class, following an attendance contract, and meeting with the school psychologist. The Multi-Tiered System of Supports ("MTSS") team would monitor Student's progress and performance, and the team would reconvene on October 20, 2025, to consider whether different interventions were needed.

54. After the IEP meeting, Student had assured Parent she would "lock in" and improve her attendance and grades. They discussed that, if Student did so, she could stay at Palmer but otherwise they would look at other schools. Student "started strong for a couple of weeks" but then decompensated to the point of refusing to get out of bed and refusing to attend school "despite all sorts of motivations and consequences." On September 22, 2025, Parent disenrolled Student from Palmer and enrolled her at GOAL High School ("GOAL"), an online charter school authorized by Falcon School District 49 and not operated by the District.

55. The October 20, 2025 IEP team meeting was cancelled because Student was no longer enrolled in the District.

56. Student performed poorly while enrolled at GOAL. Parent reported that she frequently stayed in bed all day every day with the shades drawn and the lights off. She had only three online classes, and by November 12, 2025, she was failing all three.

57. Despite the description of severe isolative and avoidant behaviors, there is no persuasive evidence that Student received any mental health evaluations or treatment during this time.

58. Parent contacted the District on November 14, 2025, about re-enrollment. The District suggested the Achieve Online school or The Bijou School ("Bijou"). Parent did not think online school would work, given Student's experience at GOAL, but she agreed to placement at Bijou.

59. Parent filed a Due Process Complaint on November 18, 2025.[3]

***E. Reenrollment in the District***

60. On December 2, 2025, Student was enrolled at Bijou, which is a considered an "alternative" or "opportunity" school. Many students at Bijou have various mental health risk factors, and the school is specifically geared to provide appropriate support.

61. Karla Castro, the Bijou school counselor, proposed to evaluate Student for a Section 504 Plan "to ensure she received appropriate support in her classes." On January 22, 2026, a Section 504 Plan meeting was convened. The 504 Plan included accommodations such as chunking assignments into smaller parts, physical proximity to positive role models, and nonverbal cues for redirection. The team also implemented a modified schedule that allowed Student to start her day at 9:45 a.m. to build momentum and address previous attendance concerns. Student responded positively to this arrangement and eventually requested to start school earlier at 8:30 a.m., which Ms. Castro viewed as a significant sign of progress. Student has demonstrated increased engagement during daily check-ins with staff, and participation in small groups, where she connects with peers and expresses herself with more depth and detail. Ms. Castro has observed Student laughing and socializing in class, noting that Student's

---

[3] Although the Due Process Complaint is dated November 14, 2025, it was received and therefore considered "filed" on November 18, 2025.

personality has begun to emerge in the school setting. Regarding academic and career progress, Student earned a computer applications credit quickly and passed most of her classes during the previous quarter. Student has explored various career pathways, including interests in the medical field and cosmetology.

***F. January 2026 Independent Educational Evaluation ("IEE")***

62. Parent requested an Independent Educational Evaluation ("IEE"), which was approved by the District. Parent selected Dr. Boris Gindis, a psychologist in Arizona, to perform the evaluation.

63. Dr. Gindis evaluated Student on January 4 and 5, 2026, at his office in Arizona. Student initially refused to participate but eventually became more cooperative and engaged as the evaluation progressed. However, she abruptly stopped the final session and refused to complete it.

64. The assessment included cognitive measures such as the Stanford-Binet Intelligence Scales (5th Edition) and the Universal Nonverbal Intelligence Test (2nd Edition), neuropsychological screenings for sensory-motor and executive functioning, and various rating scales and checklists, such as including the BRIEF-2 and Patton Adaptive Behavior Inventory, completed by Student, Parent, and teachers.

65. Dr. Gindis opined that Student has a "trauma-mediated profile" and suffers from "Developmental Trauma Disorder" ("DTD"). Dr. Gindis conceded that DTD is not a "recognized" DSM diagnosis and, therefore, he referenced the following established DSM-5-TR disorders: (1) Unspecified Trauma and Stressor-Related Disorder, (2) Mixed Anxiety and Depressive Disorder, and (3) Unspecified Child Disorder of Social Functioning.

66. Dr. Gindis disagreed with the previous diagnoses of ADHD and ODD, opining that the indicators used to make those diagnoses were in fact secondary manifestations of trauma-related hyperarousal and impaired self-regulation rather than true neurodevelopmental conditions.

67. Dr. Gindis classified Student as having a Serious Emotional Disability ("SED") as defined by the IDEA, and opined that her emotional vulnerability significantly

interferes with her academic performance despite average to above-average cognitive abilities.

68. Dr. Gindis recommended "therapeutic educational placement" at a therapeutic boarding school, that integrates academic instruction with "intensive therapeutic services." He opined that educational interventions should be "trauma-informed" and avoid punitive or compliance-based disciplinary approaches that may exacerbate her distress. He further recommended implementing an IEP with specific, measurable goals for emotional regulation, executive functioning, and social skills development. Dr. Gindis set forth at least 27 goals he believes should be incorporated into Student's IEP.

69. Dr. Gindis opined that Student's attendance problems are "manifestations of her serious emotional disability." But he also emphasized the "complex" nature of the problem and challenge of devising appropriate solutions. Regarding specific steps that could be taken to improve her attendance, Dr. Gindis recommended measures designed to increase Student's "sense of safety, predictability, and emotional regulation, while gradually building her capacity to tolerate school routines," such as self-calming techniques, check-ins with a trusted adult, flexible or staggered start times, availability of a calm, designated space, and reduction of academic demands after absences.

70. Dr. Gindis further opined that Student requires Extended School Year ("ESY") services to prevent regression of her fragile self-regulation and academic skills.

71. At hearing, Dr. Gindis backpedaled on his recommendation that Student be placed in a long-term therapeutic boarding school, and opined Student should be placed in a residential facility for "the summer only" as an ESY option. He stated that a full-year treatment facility "is not appropriate [because] it will retraumatize her."

72. Dr. Gindis identified no specific residential program or facility he believed is appropriate for Student, other than general reference to an unidentified school "in Montana." Nor did he discuss any specific placements available within the District, or why he concluded that the District had no suitable options.

73. Dr. Gindis' opinion that Student requires placement in a residential treatment facility to achieve a FAPE is unpersuasive, for several reasons. First, his impressions are based on a one-time evaluation. Although the evaluation was thorough,

the fact remains that it is a single snapshot and not product of a longitudinal treatment relationship. Second, he rated Student's mental health difficulties and limitations significantly higher than any previous evaluator, teacher, or other school personnel. The District's witnesses testified credibly that Student's observed and known impairments are far less severe than those typically demonstrated by students who need residential placement. Finally, Dr. Gindis initially recommended a therapeutic boarding school as the "only setting" that could adequately address Student's needs. But at hearing, he reversed himself and opined that such a placement would actually *harm* Student. He then recommended that Student be placed in such a facility "for the summer." No persuasive explanation was offered to explain why Student would be expected to benefit from a summer program if a full-year program would be "traumatizing." Nor did he discuss whether Student would meaningfully participate given her high degree of resistance to various measures in the past.

74. On March 4, 2026, after reviewing Dr. Gindis' report, the Bijou IEP team convened meetings on March 4 and March 11, 2026, to consider Student's eligibility for special education services. Student declined to attend either meeting. Nevertheless, the team identified Student as a child with a disability and recommended placement of "80% or greater in the general education setting." The team prepared an IEP implementing goals, accommodations, and support consistent with Dr. Gindis' report.

75. Before receiving Dr. Gindis' report, the District had no persuasive evidence that Student experienced anxiety or depression at a level that interfered with her ability to benefit from general education. Although Parent had reported behavioral issues and significant resistance to getting up and off to school, she did not commonly describe observations indicating that anxiety or depression were the cause of those issues. Moreover, neither teachers nor other school personnel observed signs of significant anxiety or depression, such as panic attacks, hypervigilance, frequent expressions of fear or worry, crying episodes, or social isolation. Rather, the Student's observable behaviors and actions in the school setting were consistent with, and therefore reasonably attributed to, her established diagnoses of ADHD and ODD.

76. As of the hearing, Parent had not signed the Consent form allowing the District to implement the IEP and provide special education services.

***G. Notable witness testimony not previously discussed***

77. The District presented extensive testimony from multiple witnesses during their case-in-chief. The testimony of the District's witnesses is generally credible and persuasive. While it is neither practical nor necessary to provide a comprehensive recitation of testimony, some specific points not previously addressed warrant mention.

78. Ms. Raymond explained that Student's attendance was a persistent concern throughout her time at Palmer High School, often driven by her preference for socializing with friends. Ms. Raymond observed that Student missed classes for a variety of reasons, including being home sick and skipping specific periods. Tardiness was particularly problematic following the lunch period, which Ms. Raymond (and others) attributed to the school's downtown location with proximity to many "enticing" fast-food and options and other distractions. This is a widespread issue among the general student population at Palmer as well. Ms. Raymond collaborated with Parent on various management strategies to address these challenges. Their discussions included a plan to restrict Student's off-campus lunch money to once a week to encourage her to stay on campus for afternoon classes. Ms. Raymond also facilitated access to transportation to assist with attendance. Administrative measures, such as an attendance contract, were also pursued through the dean of students and the MTSS team.

79. Ms. Shearer testified regarding the IDEA's general requirements and procedures, and their specific application in Student's case. Ms. Shearer serves as the Chief of Student Experience and Success for the District and previously held the position of Executive Director of Special Education. Ms. Shearer is a licensed school psychologist, principal, and special education director with twenty-one years of experience. Throughout her career, she has conducted or supervised hundreds of special education eligibility evaluations. In her current role, she oversees special education programming and ensures schools follow the requirements of the IDEA.

80. Ms. Shearer testified that Student's 2023 and 2024 IEPs were reasonably calculated to enable her to make progress in light of her circumstances. After reviewing progress reports from the 2024 IEP, Ms. Shearer concluded that Student's growth and

trend lines demonstrated a reasonable educational benefit. Even though Student did not achieve every goal, she made progress and received an educational benefit while attending District schools in 2023 and 2024.

81. Ms. Shearer explained that the information available to the District prior to Dr. Gindis' IEE did not show that Student met the criteria for SED. Regardless, she explained that Student's eligibility under the OHI category "opened the door" to special education services, and student received services reasonably tailored to her individual circumstances and needs, regardless of the specific classification.

82. Ms. Shearer disagreed with Dr. Gindis' recommendation for a therapeutic day school or residential boarding school. She argued that the IEE report relied heavily on clinical and testing data but failed to adequately account for Student's actual school experiences or her progress on IEP goals. She observed that the IEE seemed to be based primarily on information from the family and Student's history rather than the effectiveness of interventions used at school. Ms. Shearer also pointed out that the IEE did not include any specific behaviors in the school setting that would make a residential placement logical. Ms. Shearer further explained that the District typically reserves residential placements for students who have exhausted all other support levels and demonstrate behaviors that pose a danger to themselves or others. She maintained that educational data showed Student making progress and receiving a benefit in a less restrictive environment. The information in the IEE does not indicate a severity of demonstrated behaviors that would justify skipping over less restrictive educational options and placing Student in a residential facility.

83. Ms. Shearer's testimony is credible and persuasive.

## Conclusions of Law

### *A. Burden of Proof*

In an administrative due process hearing under the IDEA, the burden of proof rests with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49 (2005). As a result, it is Parent's burden to prove by a preponderance of the evidence that the District violated

the IDEA and failed to provide Student a FAPE. If the District denied a FAPE, it is also Parent's burden to prove entitlement to compensatory relief.

***B. Statute of Limitations***

A party must request a due process hearing within two years of the date the party "knew or should have known about the alleged action forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.507(a)(2). The filing date of a Due Process Complaint ("DPC") is the date it was received by the State agency. In this case, Parent's DPC was received on November 18, 2025. Therefore, any claim that the District denied FAPE before November 18, 2023 is time-barred.

***C. Jurisdiction to enforce the August 2023 settlement agreement***

The IDEA provides that a settlement agreement reached between a parent and a school district is enforceable "in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(f)(1)(B)(iii)(II). Here, the parties' August 2023 Settlement Agreement contains enforceability and jurisdictional provisions tracking the federal statute. At the hearing, Parent acknowledged that the ALJ lacks jurisdiction to enforce the Settlement Agreement. Because the Office of Administrative Courts is not a "State court of competent jurisdiction" for purposes of 20 U.S.C. § 1415(f)(1)(B)(iii)(II), and because Parent has conceded the point, the ALJ had no authority to order the District to comply with any provision of the settlement agreement.

***D. The requirements of FAPE***

The purpose of the IDEA is to ensure that children with disabilities have available a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. § 1400(d)(1)(A). Central to the obligation to provide FAPE is the requirement that local school districts develop, implement, and revise an "individualized education program" ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 399 (2017). The level of "progress" that is deemed "appropriate" will necessarily vary

depending on the nature and severity of the student's disability. However, for children receiving instruction in the regular classroom, an IEP should generally be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Bd. of Education v. Rowley*, 458 U.S. 176, 203-204 (1982). The IDEA does not guarantee any educational outcome, and a school district does not fail to provide FAPE merely because a student with an otherwise adequate IEP fails to achieve the anticipated or hoped-for progress. *Id.; see also Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1155 (10th Cir. 2008).

When assessing the adequacy of an IEP, the court must bear in mind that "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F., supra,* at 399. (emphasis in original). Moreover, because IEPs are "prospective" in nature, their adequacy must be considered "as of the time it is offered to the student." *Alex W. v. Poudre School District R-1*, 94 F.4th 1176, 1189 (10th Cir. 2024); *see also*, *O'Toole v. Olathe District Schools Unified School District No. 233*, 144 F.3d 692, 701 (10th Cir. 1998) (cautioning against "Monday Morning Quarterbacking" when reviewing an IEP in light of later-obtained information).

The IDEA contains multiple procedural mechanisms intended to enhance the reliability and appropriateness of IEPs developed for specific students. An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" by the child's "IEP Team," which is composed of the child's parents, teachers, a representative of the local education agency, and others. 20 U.S.C. § 1414(d)(A)-(B). The IEP must contain statements about the child's current educational performance, the annual goals for the child's education, the special educational services and other aids that will be provided to the child, and the extent to which the child will spend time in school environments with non-disabled children, among other things. Section 1414(d)(1)(A). Because parental involvement is critical for the success of any IEP, the IDEA requires that parents be given prior written notice ("PWN") whenever a school district proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE. 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503.

Procedural violations do not automatically constitute a denial of FAPE. Rather, a procedural inadequacy amounts to a denial of FAPE only if it: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Consistent with this framework, courts have held that procedural violations that are merely technical in nature, without a demonstrated nexus to the child's educational opportunity or the parents' meaningful participation, do not support a finding that FAPE was denied. *E.g.*, *Endrew F., supra*.

***E. Parent failed to prove a denial of FAPE in the 2023-2024 school year***

Parent failed to prove that the District denied Student a FAPE during the 2023-2024 school year. To the contrary, the District had a substantively adequate IEP in place throughout the year. The 2023 IEP addressed Student's ADHD diagnosis and related executive functioning deficits by providing specialized services in organization and self-advocacy. The IEP team established measurable goals targeting attendance, social skills, and academic organization. During the first quarter of the school year, Student demonstrated the adequacy of these supports by earning passing grades and making progress toward her goals. While Student's performance declined in the spring semester, this decline resulted from external factors such as inconsistent medication and school avoidance rather than a lack of appropriate programming. Furthermore, the IDEA "cannot and does not promise any particular educational outcome." *Endrew F., supra*, at 398.

The District appropriately considered Student's behavioral needs by conducting a Functional Behavior Assessment (FBA) in September 2023. Although Parent reported behavioral challenges occurring at home, school personnel did not observe similar behaviors at school. The FBA revealed that Student's classroom behaviors, such as excessive talking and task avoidance, did not warrant a formal Behavior Intervention Plan. Instead, the District attempted to motivate Student through various leadership roles and academic incentives, which Student ultimately declined. These efforts demonstrate that the District proactively managed Student's behavioral needs within the

general education environment and reasonably calculated the IEP to enable progress in light of her circumstances.

The temporary interruption of counseling services due to staff medical leave did not constitute a denial of FAPE. The District satisfied its procedural obligations by providing Parent with a Prior Written Notice regarding the staff shortage and the monitoring of missed services. Although Student missed counseling sessions during the fall semester, the District tracked these minutes and successfully provided compensatory services through a contract social worker before the end of the school year. This minor procedural delay did not impede Student's right to a FAPE or cause a deprivation of educational benefits, as the District eventually fulfilled all required service minutes.

***F. Parent failed to prove a denial of FAPE during the 2024-2025 school year***

Parent failed to prove that the District denied a FAPE during the 2024-2025 school year prior to the revocation of consent for services in April 2025. The District provided a substantively adequate IEP for the 2024-2025 school year based on the information available at the time. During the September 2024 annual review, the IEP team addressed Student's ADHD diagnosis through specific goals in self-advocacy, organization, and writing. The IEP called for specialized instruction and mental health counseling tailored to Student's needs. Although Parent requested an attendance goal, the team saw no evidence establishing a causal link between Student's disability and prior attendance issues. The District further supported Student's attendance by offering transportation and providing Parent with PowerSchool access. Parent failed to prove that Student's chronic attendance problems were causally related to her disability.

The District effectively implemented the IEP through flexible and specialized settings. Student participated in an affective needs class taught by Ms. Steinbach, who observed that Student was academically capable and engaged when present. When Student refused to participate in individual counseling sessions, Ms. Scheidt adapted the delivery of mental health services by providing support within the classroom setting to build rapport and address IEP goals. Ms. Scheidt also remained available to Student despite the request to pause counseling in March 2025. These adjustments

demonstrate that the District proactively sought to provide educational benefits despite Student's resistance to services.

The District fulfilled its obligations until Parent and Student revoked consent for services in April 2025. Ms. Raymond provided appropriate advisement regarding the consequences of this revocation, and the District ceased services only after receiving the executed form. Because the 2024 IEP was reasonably calculated to enable Student to make progress in light of her circumstances, and the District provided services until the legal revocation of consent, no denial of FAPE occurred during the 2024-2025 academic year.

***G. The District's decision to classify Student under the OHI category rather that the SED category during 8th and 9th Grades did not result in a denial of FAPE***

Eligibility for IDEA protections requires that a child has one of the enumerated qualifying disabilities and, because of that disability, needs special education and related services. 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(a)(1). One qualifying category is "Emotional Disturbance," which is identified in Colorado's regulations as "Serious Emotional Disability" or "SED." 34 C.F.R. § 300.8(c)(4)(i); 1 C.C.R. 301-8, Rule 2.09(3).

SED is defined as a condition exhibiting one or more of five specified characteristics, each of which must be present "over a long period of time and *to a marked degree*," and in a manner that adversely affects the child's educational performance. 34 C.F.R. § 300.8(c)(4)(i) (Emphasis added). The five characteristics are:

(1) an inability to learn that cannot be explained by intellectual, sensory, or health factors;

(2) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(3) inappropriate types of behavior or feelings under normal circumstances;

(4) a general pervasive mood of unhappiness or depression; or

(5) a tendency to develop physical symptoms or fears associated with personal or school problems. 34 C.F.R. § 300.8(c)(4)(i)(A)-(E); 1 C.C.R. 301-8, Rule 2.09(3)(a)(i)-(v).

The Colorado regulations further require that the child exhibit one of the following characteristics:

(1) Impairment in academic functioning as demonstrated by an inability to receive reasonable educational benefit from general education which is not primarily the result of intellectual, sensory, or other health factors, but due to the identified serious emotional disability; or

(2) Impairment in social/emotional functioning as demonstrated by an inability to build or maintain interpersonal relationships which significantly interferes with the child's social development. Social development involves those adaptive behaviors and social skills which enable a child to meet environmental demands and assume responsibility for his or her own welfare. Rule 2.09(3)(b)(i), (ii).

To qualify as a child with an SED, there must be documentation of ***all*** the following qualifiers:

(1) A variety of instructional and/or behavioral interventions were implemented within general education and the child remains unable to receive reasonable educational benefit from general education.

(2) Indicators of social/emotional dysfunction exist *to a marked degree*; that is, at a rate and intensity above the child's peers and outside of his or her cultural norms and the range of normal development expectations.

(3) Indicators of social/emotional dysfunction are *pervasive*, and are observable *in at least two different settings* within the child's environment. For children who are attending school, *one of the environments shall be school.*

(4) Indicators of social/emotional dysfunction have existed over a period of time and are not isolated incidents or transient, situational responses to stressors in the child's environment. Rule 2.09(3)(c)(i)-(iv) (emphasis added).

Parent failed to prove that the District's decision to identify Student under the OHI category rather than SED caused a denial of FAPE. An SED classification requires that a student exhibit specific emotional characteristics to a "marked" degree and over a long period of time. These indicators must be pervasive and observable in at least two different settings, one of which must be the school. Before Dr. Gingis' report was issued, the available evidence did not satisfy these criteria. While Parent reported

significant levels of anxiety and depression at home, teacher assessments and school-based observations consistently placed Student's emotional and functional problems within the average range. Ms. Scheidt and other school staff described Student as socially well-adjusted, respectful, and academically capable when present, which directly contradicted the regulatory requirement for a "marked degree" of dysfunction within the school environment.

More importantly, the specific disability label assigned to Student did not deprive her of educational benefits because the OHI classification effectively allowed the District to provide all necessary special education and related services. As Ms. Shearer explained, the OHI designation based on Student's ADHD diagnosis opened the door to a full range of supports tailored to her individual needs. The District developed IEPs that included specialized instruction in organization and writing, as well as mental health counseling and social work services. These services targeted Student's demonstrated deficits regardless of whether the team attributed them to ADHD or an emotional condition. Because the IDEA requires a program reasonably calculated to enable progress rather than the application of a specific diagnostic category, the District satisfied its substantive obligations by providing an IEP that addressed Student's unique circumstances.

The District's eligibility determination under the OHI category was appropriate based on the information available to the IEP team at the time. Prior to the independent evaluation by Dr. Gindis, the District lacked persuasive medical or educational data to substantiate that Student's school avoidance was a manifestation of a serious emotional disability. Indeed, the District had minimal medical evidence, and no medical opinion evidence showing a nexus between the attendance issues and a disability. Although medical evidence is not required or dispositive, its presence or absence is an important factor when evaluating whether the District's actions were reasonable under the circumstances. This is particularly true with respect to teasing out conditions with overlapping functional impacts such as ADHD, ODD, and anxiety. Witnesses such as Ms. Raymond and Ms. Shearer provided credible testimony that Student's attendance challenges appeared linked to peer socialization and external factors rather than a pervasive emotional impairment. The District fulfilled its procedural and substantive

duties by monitoring Student's progress, adjusting services when possible, and maintaining an eligibility status that provided her with access to specialized instruction and mental health supports throughout the 2023-2024 and 2024-2025 school years.

***H. Parent proved the failure to identify Student as having a disability and implement an IEP in the 2025-2026 school year caused a denial of FAPE.***

Parent proved that the District denied Student FAPE by failing to develop and implement an IEP for the 2025-2026 school year. The determination that Student no longer qualified for special education services was inconsistent with her documented history of disabilities and eligibility. Student has required specialized support since 2013, and her ADHD-related and executive functioning deficits remained present throughout her enrollment at Palmer High School. Although Parent briefly revoked consent for services in April 2025, the District had no evidence that Student's underlying impairments had resolved during the following months. By finding Student ineligible for an IEP despite this history, the District failed to recognize that her needs persisted and required ongoing specialized instruction to ensure educational progress.

Although Parent's revocation of consent meant the Fall 2025 evaluation was technically an "initial evaluation", this procedural distinction did not create a blank slate regarding Student's needs. The District had educated Student for several years and knew the nature of her disabilities. Treating the evaluation as a completely new inquiry elevates form over substance. The distinction between an "initial evaluation" and a "reevaluation" may have dictated specific protocols, but it did not alter the substance of Student's needs or the District's long-standing knowledge of her condition.

The evidence from the start of the 2025-2026 school year actually suggested a worsening of Student's condition rather than any material improvement that would justify finding her ineligible. During IEP meetings, Student attributed school avoidance to depression and a lack of motivation. Parent's responses to standardized assessments also indicated clinically significant levels of anxiety and depression. Teacher responses, while indicating far less severe levels of impact than Parent's ratings, still showed indicators of mental health issues impacting Student's performance.

The District's determination was undoubtedly influenced by Student's refusal to cooperate in the evaluation, her past failure to access various services that were made available, and her strong resistance to being labeled a "special ed" student. However, a student's reluctance to accept a disability label or participate in special education services does not relieve the district of its obligation to identify, evaluate, and provide a free appropriate public education through an IEP when the student is eligible and requires one.

Additionally, the District's eventual determination in March 2026 that Student qualified for special education services, following the evaluation by Dr. Gindis, confirms that her eligibility should have been established at the start of the school year.

The failure to identify Student as a child with a disability and implement a timely IEP school year caused a denial of FAPE. This was not like the prior years, when the District created well-supported IEPs and Parent simply disagreed about the details. The District's erroneous decision resulted in student having ***no IEP at all*** for the 2025-2026 school year. Although reasonable minds can disagree about the exact content of the IEP suitable for Student, the evidence clearly demonstrates that her needs are greater than "none."

Admittedly, and to its credit, the District offered Student some extra services and support despite finding her ineligible. While that mitigated somewhat the harm from the erroneous determination, those measures are not an adequate substitute for a formal IEP with goals and services specifically tailored to Student's needs. Because the District did not provide an IEP despite the clear persistence and escalation of Student's disability, she suffered a substantive deprivation of educational benefits, and consequently, a denial of FAPE.

***I. Private Residential Placement***

Disabled children must be educated in the "least restrictive environment," which means that they must be "educated with children who are not disabled" "[t]o the maximum extent appropriate" and only removed from the "regular educational environment . . . when the nature or severity of the disability of a child is such that

education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

A school district must ensure that a "continuum of alternative placements" is available to meet the needs of children with disabilities, including education in an institution or other settings as necessary. 34 C.F.R. § 300.115. In appropriate cases, an alternative placement might include placement in a private residential facility. *Jefferson County School District v. Elizabeth E.*, 702 F.3d 1227 (10th Cir. 2012). A school district is required to fund a residential placement only when such placement is "necessary" for a child to receive FAPE. 34 C.F.R. § 300.104. This occurs when a child's educational needs are inseparable from, intertwined with, or directly tied to the need for restrictive treatment. *E.g.*, *Mary T. v. School District of Philadelphia*, 575 F.3d 235 (3rd Cir. 2009); *Ashland School District v. Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir. 2009).

Parent failed to prove that placement in a residential facility is the least restrictive environment in which Student can receive FAPE. A disabled student's placement must align with IDEA's mandate for the least restrictive environment. Aside from confinement to a correctional facility, residential treatment represents the most restrictive option. The record lacks sufficient evidence to demonstrate that Student requires a 24-hour institutional setting to achieve meaningful educational progress. During her time in the District, Student has been educated 80 to 100 percent of the time in the general education environment. Ms. Black, Ms. Steinbach, Ms. Raymond, Ms. Scheidt, Ms. Castro, and Ms. Alvis, all agreed that Student can receive educational benefit in the general education setting. There is no persuasive evidence of behaviors or safety concerns that would justify skipping over several levels on the continuum for Student's placement.

This request by Parent is based on Dr. Gindis' recommendation. As previously found, Dr. Gindis' opinions regarding placement in a residential treatment facility are neither credible nor persuasive. By contrast, the testimony of the District's multiple witnesses on this issue is persuasive. The preponderance of persuasive evidence show that Student can make suitable progress in a less restrictive environment when supported by an appropriate IEP.

***J. Appropriate remedy***

Having determined that the District failed to provide FAPE during the 2025-2026 school year, the question remains, what is the appropriate remedy?

Under the IDEA, courts have broad discretion to grant an aggrieved litigant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The authority to award compensatory services has been extended to ALJs in administrative hearings. *Batchelor v. Rose Tree Media School District*, 759 F.3d 266, 278 (3rd Cir. 2014). Appropriate relief is interpreted as "equitable" in nature and primarily involves compensatory education. *Ferren C. v. School District of Philadelphia*, 612 F.3d 712, 717-18 (3rd Cir. 2009). Compensatory education is designed to replace educational services the eligible child would have received if FAPE had been provided but need not be calculated "with mathematical precision." *Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. Cir. 2005).

Fashioning a compensatory remedy in this case is problematic for multiple reasons. First, Parent provided no persuasive evidence to identify or support specific compensatory remedies. Dr. Gindis' report does not discuss compensatory education and only recommended residential placement as a prospective means to provide FAPE. In any event, placement in a residential facility is not even remotely commensurate with the degree of educational harm suffered by Student. Second, Parent hampered the District's ability to mitigate the potential harm to Student by unilaterally disenrolling her from the District and placing her at GOAL, which led to cancellation of the October 20, 2025, follow-up IEP meeting. As a result of this voluntary choice, the District had no obligation, or ability, to provide FAPE from September 22, 2025, until Student re-enrolled on December 2, 2025. Finally, the District attempted to implement a new IEP on March 4, 2026, incorporating data from Dr. Gindis' report, but Parent did not consent to the services. As a result, the District could not start the special education services that otherwise would have commenced on March 4, 2026, with parental consent. 34 C.F.R. § 300.300(b); *see also Moubry v. Independent School District No. 696*, 951 F. Supp. 867 (D. Minn. 1996) (student not eligible for compensatory education during the time they were unilaterally withdrawn from the district).

In light of these factors, compensatory education will not be awarded between September 22, 2025 and December 2, 2025, or after March 4, 2026.

Considering the paucity of evidence regarding the measure of compensatory services, Student's previous IEPs provide a useful touchstone for the services she likely would have received had an IEP been in place for the 2025-2026 school year.[4] The 2024 IEP provided Special Education and Related Services in the amount of: 15 minutes per week of "Writing," 30 minutes per week of "Special Education," and 60 minutes per month of "Counseling/Psychology/Social Work Services." This produces the following calculations when applied to the 2025-2026 year:

| Start | End | # days |
|---|---|---|
| 8/12/2025 | 9/22/2025[5] | 41 |
| 12/2/2025[6] | 3/4/2026[7] | 93 |
| | | |
| Total days: | | 133 |
| Total weeks: | | 19 |

| Special instruction or service | No. Minutes |
|---|---|
| Writing | 15 min. per week |
| Special Education | 30 min. per week |
| Counseling/Psych | 60 min. per month |

| Special instruction or service | Total time lost |
|---|---|
| Writing | 285 min. (4.75h) |
| Special Education | 570 min. (9.5h) |
| Counseling/Psych | 300 min. (5 h) |

Additionally, it is appropriate to provide tutoring services to remediate presumed skill deficits that resulted from the failure to have an IEP in place. The absence of appropriate programming during the 2025-2026 school year supports an inference that

[4] The March 4, 2026 IEP would have been a better source but neither party offered it into evidence.
[5] The date Student was voluntarily disenrolled from the District.
[6] The date Student re-enrolled in the District.
[7] The date the District completed an IEP, for which consent has not been provided.

Student's ability to access and benefit from education was negatively affected, even if the extent of the deficit cannot be precisely quantified on the record presented. Accordingly, an award of four (4) hours of tutoring services is appropriate to provide Student a reasonable approximation of the benefit she was denied.

**Decision and Order**

Parent proved the District failed to provide Student a FAPE during the 2025-2026 school year, which commenced on August 12, 2025. To remedy the denial of FAPE, the District shall provide the following compensatory educational services by the end of the 2026-2027 school year: (1) 4.75 hours to support Student's needs in Writing, (2) 9.5 hours of Special Education services to be allocated as deemed best by IEP team in coordination with Parent; (3) five hours of counseling/psychological/social work services; and (4) four hours of one-on-one tutoring by a licensed special education teacher or other qualified educator selected by the District, delivered in sessions of no less than 30 minutes, addressing academic and skill-development deficits related to the Student's disability. The tutoring need not be limited to any particular subject but can be utilized in the manner deemed most appropriate by the IEP team in coordination with Parent.

Parent's claim that the District failed to provide Student a FAPE from November 18, 2023 through August 11, 2025 is denied and dismissed.

Parent's request that the District be ordered to cover the cost of placing Student in a residential treatment facility is denied and dismissed.

This decision is the final decision of the independent hearing officer, pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. §§ 300.514(a), 515(a). In accordance with 20 U.S.C. § 1415(i)(2)(A), and 34 C.F.R. § 300.516, either party may challenge this decision in any State court of competent jurisdiction or in a district court of the United States.

**Dated: May 18, 2026**

/s/ Patrick C.H. Spencer II
Administrative Law Judge

## Certificate of Service

I hereby certify that a true and correct copy of the above **Decision** was served by certified mail to:

Anastasia Winslow
1332 North Tejon Street
Colorado Springs, CO 80903
*Complainant (pro se)*

Deborah S. Menkins, Esq.
Julie Bellville, Esq.
Martha Kohlstrand, Esq.
Taft Stettinius & Hollister LLP
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
*Attorneys for Respondent*

And via Synplicity upload to:

Gloria Alaniz
Colorado Department of Education
Exceptional Student Leadership Unit

Dated: May 18, 2026

/s/ Katherine Singleton
Office of Administrative Courts